# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Empire Die Casting Co., Inc. | ) | Case No. 13-52996 |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Marilyn Shea-Stonum |

**DEBTOR'S MOTION FOR THE ENTRY OF ORDERS (I) APPROVING BIDDING PROCEDURES (II) SCHEDULING AN AUCTION OF DEBTOR'S ASSETS AND A HEARING TO CONSIDER THE SALE OF THE DEBTOR'S ASSETS AND TO APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO, (III) APPROVING THE SALE OF THE ASSETS, OR ANY SUBSET THERETO, TO THE PROPONENTS OF THE HIGHEST AND BEST BIDS FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS; AND (IV) APPROVING THE PROCEDURES TO PROVIDE NOTICE OF ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS, AND FIXING CURE AMOUNTS THEREON**

Empire Die Casting Co., Inc. (the "Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 case, hereby moves the Court for the entry of an order substantially in the form attached hereto as Exhibit A (the "Bid Procedures Order"): (a) approving the bidding procedures to be used in connection with the proposed sale of substantially all of the Debtor's assets, or any subset thereof (the "Assets" or "Acquired Assets") to New Growth Capital Group, LLC (the "Purchaser"), subject to higher and better offers pursuant to Sections 105, 363, and 365 of Title 11 of the United States Code (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002(a)(2), 6004 and 6006, including the terms of the Letter of Intent substantially in the form attached hereto as Exhibit B (the "LOI"); (b) scheduling an auction (the "Auction") and a hearing (the "Sale Hearing") to consider the sale and approve the form and manner of notice related thereto; (c) approving the sale of the Acquired Assets, or any subset thereto, to the proponents of the highest and best bids; (d) approving the procedures to

provide notice of assumption and assignment of leases and contracts and fixing the cure amounts thereon; and (e) seeking other related relief (the "Motion").

In support of this Motion, the Debtor respectfully represents as follows:

## Jurisdiction and Venue

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are Sections 105, 363, and 365 of the Bankruptcy Code and Rules 2002(a)(2), 6004, 6006, and 9014 of the Bankruptcy Rules.

## Background

4.      On October 16, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

5.      The Debtor is operating its businesses as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed.

**A.      Summary of Capital Structure and Current Business Operations**

6.      The Debtor is a corporation formed under the laws of the State of Ohio.  The Debtor provides precision aluminum and zinc cast parts to a wide variety of customer specifications and is located in Macedonia, Ohio.

7.      Richard Rogel ("Rogel") is the Chairman and Chief Executive Officer of the Board of the Debtor.  Rogel owns 97.7% of the shares of the Debtor.  The remaining 2.3% of the shares are held by various individuals and employees of the Debtor.

13-52996-mss    Doc 35    FILED 10/21/13    ENTERED 10/21/13 14:19:59    Page 2 of 27

8.     The Debtor's headquarters and sole operating facility is located at 635 East Highland Road, Macedonia, Ohio (the "Facility").  The Debtor owns the Facility.

9.     The Debtor employs 211 employees: 171 hourly and 40 on salary.  Of the 171 hourly employees, 169 are members of the Industrial Maintenance and Vending Machine Service Employees Local Union 416, affiliated with the International Brotherhood of Teamsters (the "Union").

10.    The Debtor's annual sales for the last fiscal year were approximately $34 million.

**B.     Prepetition Debt Structure**

***Prepetition Obligations***

11.    Obligations under the Pre-Petition Credit Agreement.  As of the Petition Date, the Debtor was party to a certain Amended and Restated Loan and Security Agreement, dated as of January 12, 2011(the "Pre-Petition Credit Agreement")[1], among the Debtor, as borrower (the "Borrower"), and FirstMerit Bank, N.A., as successor in interest to Citizens Bank ("FirstMerit"), as lender (the "Pre-Petition Lender" and in its capacity as debtor-in-possession lender (the "Lender").  Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lender provided Debtor with a revolving credit facility (the "Revolving Facility") in the aggregate principal amount of up to $4,500,000.   As of October 15, 2013, the outstanding unpaid balance under the Revolving Facility was at least $4,948,165.41, which includes an Overadvance (as defined in the Pre-Petition Credit Agreement) of $950,000. Also pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lender provided Debtor with a term loan (the "Term Facility") on January 12, 2011 in the amount of $447,499.87.  As of October 15, 2013, the outstanding unpaid balance under the Term Facility was at least $139,843.84.  Also pursuant to the Pre-Petition Credit

---

[1] The Pre-Petition Credit Agreement amended and restated that certain Loan and Security Agreement dated as of September 27, 2007, among the Debtor as borrower and Citizens Bank as lender.

Agreement, the Pre-Petition Lender provided Debtor with a real estate term loan (the "Real Estate Term Facility") on January 12, 2011 in the amount of $4,500,000. As of October 15, 2013, the outstanding balance under the Real Estate Term Facility was $3,688,208.57. Also pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lender provided Debtor with a capital expenditure loan (the "CapEx Loan") on January 12, 2011 in the amount of $500,000. The CapEx Loan was terminated in its entirety and cancelled as part of Fifth Amendment to Forbearance Agreement dated October 14, 2012. There is no balance owing on the CapEx Loan.

12.     Forbearance Agreements.  As a result of certain defaults under the Pre-Petition Credit Agreement, Debtor and the Pre-Petition Lender entered into a forbearance agreement dated effective as of December 28, 2011, as amended by a First Letter Amendment to Forbearance Agreement dated February 7, 2012, a Second Amendment to Forbearance Agreement dated April 30, 2012, a Third Amendment to Forbearance Agreement dated August 31, 2012, a Fourth Letter Amendment to Forbearance Agreement dated September 28, 2012, a Fifth Amendment to Forbearance Agreement October 14, 2012, a Sixth Amendment to Forbearance Agreement April 30, 2013, a Seventh Amendment to Forbearance Agreement dated May 31, 2013, an Eighth Amendment to Forbearance Agreement dated June 30, 2013, a Ninth Amendment to Forbearance Agreement dated July 31, 2013, a Tenth Amendment to Forbearance Agreement dated August 2, 2013, an Eleventh Amendment to Forbearance Agreement dated August 31, 2013, and a Twelfth Amendment to Forbearance Agreement dated October 11, 2013, providing in part for the Pre-Petition Lender's agreement to forbear from exercising its rights and remedies under the Loan Documents (as defined in the Pre-Petition Credit Agreement, as amended from time to time, including, without limitation, by the Forbearance Agreements) under

the terms and conditions more fully set forth therein (collectively, the "Forbearance Agreements").

*Security*

13.     Pursuant to the Pre-Petition Credit Agreement, Debtor granted to the Pre-Petition Lender to secure the prompt payment and performance of the Obligations (as defined in the Pre-Petition Credit Agreement), a lien on and continuing security interest in the Collateral as defined in the Pre-Petition Credit Agreement.  The Collateral consists of all real and personal property of the Debtor.  Pursuant to that certain Open-End Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated as of January 12, 2011 (the "Pre-Petition Mortgage"), from Debtor in favor of the Pre-Petition Lender, Debtor has mortgaged to the Pre-Petition Lender all of its respective right, title and interest in and to the Mortgaged Property (as defined in the Pre-Petition Mortgage).  The Pre-Petition Mortgage secures the performance of the covenants and agreements contained in the Pre-Petition Mortgage, the Pre-Petition Credit Agreement and the other Loan Documents (as defined above) and secures the payment when due of (i) the obligations of the Borrower under the Pre-Petition Credit Agreement and the Notes (as defined in the Pre-Petition Credit Agreement), together with applicable interest, (ii) all amounts expended or advanced by the Pre-Petition Lender pursuant to any Loan Document and (iii) all unpaid advances made by the Pre-Petition Lender, with respect to the Mortgaged Property, for the payment of taxes, assessments, insurance premiums and all other liabilities and indebtedness owing by Borrower to the Pre-Petition Lender.  The liens, security interests and/or mortgages granted by the Borrowers to the Pre-Petition Lender prior to Petition Date, including, without limitation the liens, security interests and mortgages granted in the Pre-Petition Credit Agreement and the Pre-Petition Mortgage, are referred to herein as the "**Pre-Petition Liens.**"

*Non-Debtor Guaranties*

14.     Richard P. Rogel executed and delivered that certain Limited Guaranty Agreement, dated as of December 28, 2011 (as amended, restated, modified, reaffirmed, or supplemented from time to time, the "Over-Advance Guaranty Agreement").

**C.     Events Leading To The Filing Of These Chapter 11 Cases**

15.     The Debtor has robust capabilities providing precision cast parts to customer specifications.  However, the Debtor has confronted several operational and financial challenges that have strained its resources.  Over the last five years, profitability and cash flow have deteriorated due to production inefficiencies which caused inflated overtime costs, premium freight charges, containment costs, and yield issues.  In addition, indirect costs increased and an ineffective implementation of a new enterprise resource planning (ERP) system made it difficult to manage costing and pricing.

16.     Pursuant to its collective bargaining agreement with the Union, the Debtor contributes to the Maintenance Employees Union Local No. 416 Pension Fund, a multiemployer pension plan (the "MEPP").  The Debtor's contribution obligations to the Plan are a substantial source of the Debtor's financial stress.  Furthermore, the Debtor may lack the ability to withdraw from the MEPP outside of bankruptcy without incurring a substantial withdrawal liability (the "MEPP Withdrawal Liability").

17.     The Debtor has concluded that a going concern sale of its Assets and business is necessary.  On August 13, 2013, the Debtor retained Amherst Capital Partners, LLC ("Amherst") for the purposes of finding a buyer with the capital to be able to provide the Debtor with a solid financial basis for continuing in business.  Amherst was able to find a number of parties potentially interested in acquiring the Assets of the Debtor as a going concern.

- 6 -

D.      **Marketing Efforts**

18.      Since August, 2013, the Debtor, with the assistance of its professionals, including in particular Amherst, has actively marketed its Assets for sale as a going concern.  In connection with its marketing efforts, Amherst identified approximately 119 potentially interested parties, which were comprised of strategic and financial purchasers.  Through Amherst's efforts, the Debtor entered into confidentiality agreements with 38 entities so that they could receive the confidential offering memorandum prepared by Amherst regarding the Debtor's Assets and business operations and so that they could conduct other due diligence.  Of this group, approximately 9 provided written expressions of interest or letters of intent to acquire the Assets. Additionally, some parties have indicated that they are interested in bidding at an auction of the Assets.

19.      On or about October 10, 2013, the Debtor, after consultation with the Pre-Petition Lender, entered into a Letter of Intent (the "LOI")[2] for the purchase of substantially all of its Acquired Assets with Purchaser in accordance with Section 363(f) and 365 of the Bankruptcy Code.  The LOI provides that until the entry of the Bid Procedures Order, the Purchaser shall have exclusive dealings with the Debtor.  Notwithstanding this exclusivity period, the Debtor (with the consent of the Purchaser) will continue to respond to due diligence requests from prospective purchasers, including accommodating tours of Debtor's facility and meetings with Debtor's management.

20.      The sale to the Purchaser is subject to the receipt of higher and better offers and an auction as set forth in the following proposed bidding procedures (the "Bidding Procedures"):

---

[2] The Debtor and the Purchaser are in the process of negotiating a definitive agreement (the "Stalking Horse APA"), which shall be executed no later than the entry of the Bid Procedures Order. A copy of the Stalking Horse APA will be circulated to all creditors and parties in interest in connection with the Sale Notice.

a. Solicitation Process; Distribution of Bidding Procedures and Definitive Agreement. Debtor shall distribute (i) the Sale Notice (defined below), (ii) these Bidding Procedures, and (iii) a copy of Purchaser's Definitive Agreement (as such, the "Stalking Horse APA") as required by the Bankruptcy Court in connection with the Sale Motion.

b. Eligibility of Bidders to Participate in Auction. In order to be eligible to bid for the Acquired Assets or otherwise participate in the Auction (defined below), each bidder must be determined by Debtor upon consulting with the Lender and any Official Committee of Unsecured Creditors appointed in the Bankruptcy Case to be a "Qualified Bidder" (defined below). Debtor shall have the right, in consultation with the Lender, to determine whether a bidder is a Qualifying Bidder (a bid being submitted by a bidder determined to be a Qualifying Bidder and to have otherwise satisfied the requirements of paragraph (c) below being a "Qualifying Bid").

c. Qualification of Bidders. In order to be considered for status as a Qualifying Bidder, a bidder (other than the Purchaser and the Lender, who are each deemed to constitute a Qualifying Bidder having submitted a Qualifying Bid) must:

   (i) Deliver to Debtor's counsel at attn.: Marc Merklin Brouse McDowell, LPA, 388 S. Main Street, Suite 500, Akron, Ohio 44311 so as to be received by Debtor's counsel before **5:00 p.m. (Eastern Time) on December 16, 2013,** (the "Bid Deadline"), a written offer or group of offers (a "Qualifying Bid") that:

      1) consists of an executed form of the Stalking Horse APA, marked to show any proposed revisions, which is acceptable to Debtor, that provides for the purchase of the Acquired Assets, and clearly specifies the amount such bidder is willing to pay, which amount must be at least $250,000.00 greater than the Purchaser's Purchase Price contained in the Stalking Horse APA (such aggregate amount, the "Minimum Upset Bid") (such bidder's executed APA, the "Bidder APA");

      2) does not contain any contingencies to the validity, effectiveness, and/or bidding nature of the bid beyond those contained in the Stalking Horse APA, including, without limitation, contingencies for due diligence, financing of any kind, or inspection;

      3) contains documentation acceptable to Debtor after consultation with the Lender and any Official Committee of Unsecured Creditors evidencing that the bidder has

- 8 -

financial resources sufficient in the aggregate to finance the purchase of the Acquired Assets proposed to be acquired and close the transaction within the time frame established, which evidence may include, without limitation, evidence of cash on hand, a binding financing commitment from an established and financially sound financial institution or investment fund and the identity of contact persons at the entity issuing such commitment letter;

4) demonstrates, to Debtor's satisfaction after consultation with the Lender and any Official Committee of Unsecured Creditors, that the bidder has the legal capacity to consummate the transaction it is proposing;

5) includes a statement from the bidder that (i) it is prepared to enter into and consummate the transactions contemplated in the Bidder APA immediately upon entry by the Bankruptcy Court of an order approving the sale of the Assets to such bidder (the "Bidder Sale Order"), but in no event later than December 31, 2013, provided there has been no order entered staying the Bidder Sale Order pending appeal and (ii) the Qualifying Bid is irrevocable through December 18, 2013; and

(ii) Before the Bid Deadline, pay an earnest money deposit of ten percent (10%) of the Minimum Upset Bid and any other consideration contained in the Bidder APA (a "Qualified Bidder Deposit") by cashier's or certified check (made payable to Debtor's legal counsel) or wire transfer of immediately available funds, which deposit shall be held by in escrow in Debtor's legal counsel's IOLTA Trust Account in accordance with the terms of an escrow agreement to be provided by Debtor, provided, however, that the Lenders are not required to pay a Qualified Bidder Deposit in connection with any credit bid under section 363(k) of the Bankruptcy Code. A Qualified Bidder Deposit will be refunded only if the bid corresponding with the Qualified Bidder Deposit is not approved by the Bankruptcy Court. Debtor reserves the right to hold each Qualified Bidder Deposit until five (5) days after the closing of the sale of the Acquired Assets.

d. Bids for Less than All Acquired Assets. Subject to the other terms and conditions of these Bidding Procedures, bids for less than all of the Assets may be submitted and may be eligible to become Qualifying Bids.

e. Denial of "Qualifying Bid" Status to Non-Conforming Bids. At Debtor's discretion, after consultation with the Lender and any Official Committee of Unsecured Creditors, Debtor may decline to accept as Qualifying Bids

any bids that do not substantially conform to the foregoing requirements and any other procedures set forth in the Bid Procedures Order. Debtor shall have the right to negotiate with any bidder solely with respect to clarification or enhancement of any bid.

f.     Bid Deadline; Reporting of Qualifying Bids.  **All Qualifying Bids must be submitted to Debtor so as to be received not later than the Bid Deadline.**  After the expiration of the Bid Deadline, Debtor's counsel shall promptly provide copies of all bids received to (i) counsel for the Lender, (ii) counsel for any Official Committee of Unsecured Creditors, and (iii) counsel for Purchaser.  If Debtor's counsel does not receive any Qualifying Bids by the Bid Deadline, Debtor's counsel shall report the same to the Bankruptcy Court.

g.     Access to Debtor's Books and Records; Execution of Confidentiality Agreement.  As a condition precedent to being provided access to Debtor's books, records and executives, all bidders must (i) be determined by Debtor and Lender to have sufficient financial capability to submit a Qualifying Bid and (ii) execute a confidentiality agreement in form reasonably acceptable to Debtor.  Bidders who satisfy the foregoing requirements will be given reasonable access to Debtor's books, records and executives.

h.     Terms of Auction.  In the event that one or more Qualifying Bids are submitted in accordance with these Bidding Procedures, Debtor will conduct an auction sale of the Acquired Assets (the "Auction") on the following terms:

(i)     Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualifying Bidders at Auction.  The Auction will take place on a date and at such time no more than two (2) business days prior to that date scheduled by the Bankruptcy Court for hearing (the "Sale Hearing") to consider the Sale Motion.  The Auction will take place at the offices of the Debtor's counsel or at such other place as may be designated in writing by Debtor.  Debtor, after consultation with the Lender and any Official Committee of Unsecured Creditors, may continue or adjourn the Auction from time to time without further notice in its sole discretion.  For a Qualifying Bid to be considered, the corresponding Qualifying Bidder must appear in person at the Auction unless alternative arrangements are agreed upon in advance with Debtor and the Lender.

(ii)     Permitted Attendees at Auction.  Only representatives of Debtor, the Lender, the Official Committee of Unsecured Creditors, and any other parties invited specifically by the Debtor, and any Qualifying Bidders (and the professionals for each of the

- 10 -

foregoing) shall be entitled to attend the Auction, provided, however, that only Qualifying Bidders shall be entitled to bid at the Auction.

(iii) <u>Auction Bid Submission Procedures</u>. Auction bidding shall be subject to the following procedures:

1) In order to bid at the Auction, Qualifying Bidders must appear in person at the Auction, or through a duly authorized representative.

2) Only Qualifying Bidders shall be entitled to make any subsequent bids at the Auction.

3) Bidding will commence with the announcement of the highest and best Qualifying Bid as determined by Debtor and the Lender. Any Qualifying Bidder may then submit successive bids in minimum increments of not less than $100,000.00 (the "<u>Minimum Overbid Amount</u>"); *provided, however*, that any successive bid by the Purchaser may include a credit of $180,000.00, reflecting the amount of the Break-Up Fee (defined below).

4) If one or more Qualifying Bids are received by Debtor, each such Qualifying Bidder shall have the right to improve its respective bid(s) at the Auction.

5) Each successive bid submitted by any bidder at the Auction must contain an actual cash purchase price that exceeds the then existing highest bid by at least the Minimum Overbid Amount.

6) At commencement of the Auction, Debtor may announce procedural and related rules governing the Auction not inconsistent with these Bidding Procedures, including time periods available to all Qualifying Bidders to submit successive bid(s) in an amount equivalent to at least the Minimum Overbid Amount.

(iv) <u>Irrevocability of Bids; Rejection of Bids</u>. All Qualifying Bids, other than a credit bid by the Lenders, and successive bids at the Auction shall be irrevocable until thirty (30) days after the closing of the sale of the Acquired Assets. Formal rejection by Debtor of a Qualifying Bid or any successive bid thereto will not be deemed to have occurred unless and until (a) Debtor expressly rejects such bid or (b) the sale of the Acquired Assets to the bidder submitting the Prevailing Bid (defined below) is finally consummated.

- 11 -

(v)    <u>Selection of Prevailing Bid</u>. The Auction shall continue until there is only one bid to purchase the Acquired Assets that Debtor determines, after consultation with the Lender and any Official Committee of Unsecured Creditors, and subject to Bankruptcy Court approval, is the highest and/or best Qualifying Bid (such bid being the "<u>Prevailing Bid</u>" and such bidder being the "<u>Prevailing Bidder</u>"). In making this decision, Debtor shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of such Qualifying Bidder's ability to close the transaction and the timing thereof, and the net benefit to Debtor's estate. The Prevailing Bidder shall have such rights and responsibilities of the buyer, as set forth in the Bidder APA. Prior to the Sale Hearing, the Prevailing Bidder shall complete and execute the Bidder APA and all other agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Prevailing Bid was made (such documents being, collectively, "<u>Prevailing Bidder Sale Documents</u>"). Notwithstanding the foregoing, Debtor, after consultation with the Lender, and subject to Bankruptcy Court approval, shall have the right, but not the obligation, to accept more than one Prevailing Bid to purchase separate portions of the Acquired Assets.

i.    <u>Sale Hearing</u>. In connection with Debtor's filing of the Sale Motion, Debtor will request that the Bankruptcy Court schedule the Sale Hearing to consider approval of the Sale Motion, with notice thereof in accordance with applicable sections of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of the Bankruptcy Court. The Sale Hearing will be held at the United States Bankruptcy Court for the Northern District of Ohio at 455 U.S. Courthouse, 2 South Main Street, Akron, OH 44308, Judge Shea-Stonum's Courtroom. At the Sale Hearing, Debtor will seek the entry of the Sale Order approving and authorizing the proposed sale to the Purchaser or to the Prevailing Bidder, if any. The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

j.    <u>Closing</u>. The closing of the sale of the Acquired Assets will occur no later than December 31, 2013, in accordance with the terms of the Prevailing Bidder Sale Documents or the APA of the entity otherwise authorized by the Bankruptcy Court to purchase the Acquired Assets.

k.    <u>Failure of Prevailing Bidder to Consummate Purchase; Designation of Backup Bidder</u>. If for any reason the Prevailing Bidder fails to consummate its purchase of the Acquired Assets, Debtor may deem the bidder of the second highest and best bid for the Acquired Assets (such bidder being the "<u>Backup Bidder</u>," with such bid being the "<u>Backup Bid</u>") to have submitted the Prevailing Bid. If Debtor so designates a bidder as a

- 12 -

Backup Bidder, such Backup Bidder shall be required to complete and execute an APA in form and substance reasonably acceptable to Debtor memorializing, among other things, the amount of the Backup Bid (a "Backup Bidder APA"). If the failure by the Prevailing Bidder to consummate the purchase is the result of such Prevailing Bidder's breach of, or default or failure to perform under any Prevailing Bidder Sale Documents or the terms of these Bidding Procedures (such bidder being a "Defaulting Bidder"), such Defaulting Bidder's Qualified Bidder Deposit shall be forfeited to Debtor, and Debtor shall thereupon have the right to assert all rights and remedies available under applicable law.

l.   Determination of Cure Amounts under Assigned Leases and Contracts. As soon as reasonably possible after the filing of the Bid Procedures Motion, Debtor shall prepare and shall make available to all interested parties a schedule of Debtor's leases and other executory contracts that a bidder may request that Debtor assume and assign to such bidder under such bidder's Bidder APA (such leases and contracts being, collectively, the "Assigned Leases and Contracts"), which schedule shall include Debtor's calculation of the amount it believes must be paid to cure all defaults under each of the Assigned Leases and Contracts (collectively, the "Cure Amounts"). Debtor shall file such schedule with the Bankruptcy Court and shall serve a copy thereof on all non-debtor parties to such Assigned Leases and Contracts. **ANY NON-DEBTOR PARTY TO AN ASSIGNED LEASE OR CONTRACT WHO DISPUTES SUCH CALCULATION MUST (i) FILE WITH THE BANKRUPTCY COURT A WRITTEN CLAIM ASSERTING A CURE CLAIM THAT IS DIFFERENT FROM THE RESPECTIVE CURE AMOUNT ON OR BEFORE ANY BAR DATE SET BY THE BANKRUPTCY COURT FOR THE FILING OF SUCH CLAIMS; AND (ii) FILE WITH THE BANKRUPTCY COURT AND SERVE UPON COUNSEL FOR DEBTOR, AT MARC MERKLIN BROUSE MCDOWELL, LPA, 388 S. MAIN STREET, SUITE 500, AKRON, OHIO 44311, AN OBJECTION TO ITS SCHEDULED CURE AMOUNT ON OR BEFORE THE DATE OF THE SALE HEARING. ANY NON-DEBTOR PARTY TO AN ASSIGNED LEASE OR ASSIGNED CONTRACT WHO FAILS TO COMPLY WITH THE FOREGOING REQUIREMENTS SHALL BE FOREVER BARRED FROM (i) OBJECTING TO THE CURE AMOUNT APPLICABLE TO THAT PARTY'S ASSIGNED LEASE OR CONTRACT AND (ii) ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO THAT PARTY'S ASSIGNED LEASE OR ASSIGNED CONTRACT.** If an objection to a scheduled Cure Amount is filed in accordance with this paragraph, the Bankruptcy Court will hear that objection at the Sale Hearing.

m.   Reservation of Rights; Deadline Extensions. Subject to the consent of the Lender, Debtor shall be deemed to have reserved its rights to: (i) cancel

the Auction; (ii) subject to the consent of the Lender, extend the Bid Deadline; (iii) impose such other and additional terms and conditions or modify the terms and conditions hereof as Debtor determines to be in its best interests and (iv) reject all Qualifying Bids if, in Debtor's reasonable business judgment, no Qualifying Bid is in the best interests of Debtor's estates.

n.  Sale of Acquired Assets "As-Is, Where-Is".  All of the Acquired Assets shall be transferred on an "as-is, where-is" basis.  DEBTOR SHALL BE DEEMED TO HAVE EXPRESSLY DISCLAIMED ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY OF THE ACQUIRED ASSETS, EXCEPT AS MAY OTHERWISE BE PROVIDED IN THE APPLICABLE APA OR PREVAILING BIDDER SALE DOCUMENTS.

o.  Purchaser as Stalking Horse Bidder; Break-up Fee.  By Order of the Bankruptcy Court, the Court has approved an $180,000.00 reimbursement ("Break-Up Fee") payable to Purchaser in the event Purchaser is outbid at the Auction.  No Qualifying Bidder, other than Purchaser, shall be entitled to any break-up fee, expense reimbursement or similar type of payment, including, without limitation, any claim for substantial contribution.

p.  Break-Up Fee.  Purchaser's agreement to purchase the Acquired Assets pursuant to the Definitive Agreement is conditioned upon the Bankruptcy Court's prior approval of the above Bidding Procedures, including specifically approval of the Break-Up Fee.

The Break-Up Fee will be payable only in the event that (i) all of the conditions to Purchaser's obligation to close its purchase of the Acquired Assets under the Definitive Agreement have been satisfied and/or waived and the Definitive Agreement has not been terminated prior to the Auction, (ii) a Qualifying Bid (defined above) is submitted by a third-party Qualifying Bidder (defined above) (i.e., other than Purchaser's Qualifying Bid) prior to the Auction, (iii) anyone other than Purchaser is determined by an order of this Bankruptcy Court to be the Prevailing Bidder (defined above) approved to purchase any or all of the Acquired Assets and (iv) the Definitive Agreement has not previously terminated as the result of an uncured breach by Purchaser.  Purchaser's willingness to proceed with the Agreement is conditioned upon the Bankruptcy Court's entry of the Bid Procedures Order approving the Break-Up Fee.

Upon Bankruptcy Court approval of a sale of any or all of the Acquired Assets to a Prevailing Bidder that is not Purchaser, and assuming no prior breach by Purchaser, Debtor shall be obligated to pay Purchaser the Break-Up Fee. Purchaser's right to payment of the Break-Up Fee, if it arises, shall be treated as an allowed administrative expense pursuant to

- 14 -

Bankruptcy Code sections 503(b) and 507(a)(2), shall not be subject to any liens or security interests, and shall be approved by the Lender as a "carve-out" from the proceeds of sale of the Acquired Assets. Purchaser shall be authorized to credit bid the Break-Up Fee in connection with the Auction if Purchaser determines to submit a competing Qualified Bid to any competing bid that may be submitted by another Person that is equivalent to Purchaser's Purchase Price plus the Minimum Overbid (defined above).

q.   Lender Credit Bid: Each of the Lenders may, in its sole discretion, credit bid for any or all Assets or Acquired Assets pursuant to Section 363(k) of the Bankruptcy Code. A credit bid by a Lender shall constitute a Qualified Bid.

### Relief Requested

21.     Pursuant to this Motion, the Debtor seeks the entry of the Bid Procedures Order, (i) approving the Bid Procedures set forth above, (ii) scheduling the Auction for December 18, 2013 at 10:00 a.m. EST; (iii) scheduling the Sale Hearing for December 19, 2013 at 9:30 a.m. EST, (iv) approving the proposed manner and notice of the assumption and assignment of agreements; and (v) approving the proposed manner of notice of the Auction and Sale Hearing to be provided to parties in interest and creditors, including the form of the Sale Notice.

22.     Further, at the conclusion of the Sale Hearing, the Debtor shall request the entry of order, approving the sale of the Acquired Assets, free and clear of all liens, claims and interests, and assuming and assigning the Contracts to the Prevailing Bidder who submitted the Prevailing Bid at the Auction in accordance with the terms set forth in the Bid Procedures (the "Sale Order"). The Debtor requests that each proposed Sale Order, among other things:

a.   approve the terms of the APA for each Prevailing Bidder, and authorize the Sale of the Acquired Assets purchased by each such Prevailing Bidder pursuant to such terms;

b.   include specific findings of fact and conclusions of law which, among other things, shall determine that: (i) the Acquired Assets to be acquired by the

- 15 -

Prevailing Bidder will be purchased in good faith within the meaning of Section 363(m) of the Bankruptcy Code and that the Prevailing Bidder is entitled to the protections of such section; (ii) the APA for each Prevailing Bidder was negotiated in good faith and from arms-length bargaining positions; (iii) neither the Debtor nor the Prevailing Bidder has engaged in conduct that would permit the APA, or the sale contemplated thereunder, to be voided under Section 363(n) of the Bankruptcy Code; (iv) that the Prevailing Bidder is not a successor to the Debtor or any other person, except as otherwise expressly provided in any Sale Order; (v) that the Debtor timely and properly complied with all notice obligations set forth in the Bidding Procedures Order; (vi) the sale of the Acquired Assets was conducted pursuant' to the Bid Procedures; and (vii) the price to be paid for the Acquired Assets purchased by the Prevailing Bidder represents the highest or otherwise best offer therefor and constitutes reasonably equivalent value;

c.   provide that the sale of the Acquired Assets to the Prevailing Bidder shall be free and clear of all claims, liabilities, liens, encumbrances, and other interests, including, but not limited to, all successor liability claims under any state or federal laws, including, without limitation, any successor liability related to the MEPP ("Interests") pursuant to Sections 363(b) and (f) of the Bankruptcy Code, with such Interests (if any) to attach to the proceeds of the sale of the Acquired Assets to the same extent and with the same validity and priority as existed with respect to the Acquired Assets immediately prior to the sale;

- 16 -

d.  provide that the proceeds of the sale of the Acquired Assets be paid at closing in cash to the Lenders, except for (i) upon the consent of Lenders, any amounts necessary to satisfy the cure amounts for any assumed and assigned Contracts and (ii) any amounts in excess of the Lenders' allowed secured claims;

e.  provide that, except to the extent otherwise provided in an APA, a Prevailing Bidder shall have no liability or responsibility for any claim against or liabilities of the Debtor, including, but not limited to, any successor liability claims under any federal or state law, including, without limitation, any successor liability related to the MEPP;

f.  provide that certain Contracts as designated by the Prevailing Bidder, may be assumed by the Debtor and assigned to the Prevailing Bidder;

g.  provide for a permanent injunction enjoining the holder of any Interests from taking any action against the Acquired Assets or the Prevailing Bidder;

h.  provide that the APA and the transactions and instruments contemplated thereby shall specifically be performable and enforceable against, and binding upon, and shall not be subject to rejection or avoidance by, the Debtor or any chapter 7 or chapter 11 trustee for the Debtor or its estate or any other person acting on behalf of the Debtor or its estates;

i.  provide that the Bankruptcy Court shall retain jurisdiction to enforce the terms and provisions of the Sale Order;

j.   provide that the Prevailing Bidder and Debtor are authorized to close the proposed sale of the Acquired Assets immediately upon entry of the Sale Order and the proposed Sale Order is not stayed pursuant to Rule 6004(g); and

k.   provide that upon failure to consummate a sale of Acquired Assets to the Prevailing Bidder because of a breach or failure on the part of the Prevailing Bidder, the Debtor may select in its judgment, after consultation with the Lenders and the Committee, the Back-Up Bid for the subject Acquired Assets to be the replacement Prevailing Bid, and close a sale transaction with the respective Back-Up Bidder, without further order of the Court.

## Basis for Relief Requested

### A.   Approval of the Bid Procedures, and the Form and Manner of Notice of the Auction and Sale

23.    The Debtor submits that the proposed Bid Procedures are reasonable under the facts and circumstances of this case.

24.    Through the use of such Bid Procedures, and the additional marketing period that will occur between the hearing on the Bid Procedures and the Sale Hearing, the Debtor believes it will be able to maximize the value of the Acquired Assets and obtain the highest and best price possible.

25.    The Debtor believes that the process created by the Bid Procedures will provide it with the flexibility to sell the Acquired Assets in any combination and to select Bids, from a final set of Qualified Bidders, and will result in the highest and best purchase price for the Acquired Assets. Accordingly, the Debtor believes that the approval of the Bid Procedures provides the Debtor with the best possibility of maximizing the value of the Acquired Assets for the benefit of creditors, and, accordingly, requests that the Court approve the Bid Procedures.

26.     The Debtor requests approval of the Sale Notice in a form substantially similar to the form attached hereto as Exhibit C.  The Debtor intends to serve the Sale Notice on all creditors and parties interest in accordance with Bankruptcy Rule 2002.  Accordingly, the Debtor submits that the form and manner of the Sale Notice is adequate under the circumstances and should, therefore, be approved.

B.     **Request for Approval of Break-Up Fee**

27.     As discussed in the Bidding Procedures above, the Debtor proposes that it provide the Purchaser, as the "stalking horse bidder" a Break-Up Fee in the amount of $180,000.00.

28.     If a debtor accepts a higher bid from a party other than the stalking-horse bidder, a break-up fee customarily is paid to the stalking-horse bidder to compensate the "stalking-horse" bidder costs, including lost opportunity costs, incurred as a result of its role as a "stalking-horse" bidder.  *See In re Michael Day Enterprises, Inc.*, Case No. 09-55159 (Bankr. N.D. Ohio December 15, 2009) (approving a bid procedures, including a break-up fee for the stalking-horse bidder and allowing the stalking-horse bidder to credit bid the break-up fee); *In re LTV Steel Co., Inc.*, Case No. 00-43866 (Bankr. N.D. Ohio April 24, 2001) (D.I. 944) (approving bid protections that included a termination fee and a minimum overbid for a potential stalking-horse bidder); *In re EWI, Inc.*, 208 B.R. 885, 888 (Bankr. N.D. Ohio 1997) (noting that break-up fees customarily are paid to an unsuccessful stalking-horse bidders); *In re Hupp Industries, Inc.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992) (noting that an unsuccessful stalking-horse should be entitled to a reasonable break-up fee).

29.     The Debtor believes that because of the accelerated timetable necessary to complete a sale of its assets for maximum value, the payment of the break-up fee is essential to maintain the current interested of the Purchaser, which, in turn, will lead to a successful sale and

potentially generate higher and better offers for the Assets, thereby maximizing the value of the Assets for the Debtor's estate.

30. *In Hupp Industries*, the court set forth seven factors that it considered significant in determining whether certain bid protections, including a break-up fee, were appropriate:  (a) whether the fee requested correlates with a maximization of value to the debtor's estate; (b) whether the underlying negotiated agreement is an arm's-length transaction between the debtor's estate and the negotiating acquirer; (c) whether the principal secured creditors and the official creditors' committee is supportive of the requested fee; (d) whether the break-up fee constitutes a fair and reasonable percentage of the proposed purchase price; (e) whether the dollar amount of the break-up fee is so substantial that it provides a "chilling effect" on other potential bidders; (f) the existence of available safeguards to the debtor's estate; and (g) if unsecured creditors oppose the break-up fee, whether there exists a substantial adverse impact upon such creditors. *Hupp Industries*, 140 B.R. at 194.

31. The proposed break-up fee satisfies the factors articulated by the Hupp Industries court.  Specifically, the proposed fee (a) is fair and reasonable in light of the circumstances and proposed transaction; (b) is designed to assist, rather than hamper, the bidding process; and (c) will benefit creditors by attracting potential purchasers to maximize the value of the Assets for the estate.

32. The Debtor believes that the proposed break-up fee will not chill bidding for the Assets and does not unduly burden its estate.  Accordingly, the Debtor submits that the Court should approve the break-up fee, subject to the terms and conditions described herein.

i. **Approval of the Sale of the Assets**

33. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of

- 20 -

the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

34.    A sale of a debtor's assets should be authorized pursuant to Section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See. e.g. Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389-390 (6th Cir. 1986) ("a court can authorize a sale of a Debtor's assets when a sound business purpose dictates such action") *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Nicole Energy Services, Inc.*, 385 B.R. 201, 210 (Bankr. S.D. Ohio 2008); *In re Embrace Sys. Corp.* 178 B.R. 112, 124 (Bankr. W.D. Mich 1995); *In re North American Royalties, Inc.* 276 B.R. 860, 866 (Bankr. E.D. Tenn. 2002). The *McClung* court, following Second Circuit reasoning, noted a list of factors to consider when determining if there is a sound business purpose for a sale, including:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

789 F.2d at 389 (internal citations omitted).

35.    Furthermore, to demonstrate a sound business purpose warranting a sale, courts within the Sixth Circuit have developed a four-part test requiring a debtor to demonstrate: (1) a sound business reason; (2) accurate and reasonable notice; (3) an adequate price; and (4) good faith. *See In re Country Manor of Kenton, Inc.,* 172 B.R. 217,220-221 (Bankr. N.D. Ohio 1994).

- 21 -

36.     The Debtor believes that the present circumstances warrant approval of the sale of the Assets to the Prevailing Bidder at the Auction under the standard articulated in *McClung*. As noted above, the Debtor has marketed the Assets and will continue to market the Assets up until the Auction. The Debtor has proposed the sale of the Assets pursuant to the Bid Procedures after thorough consideration of all viable alternatives, and has concluded that proposed Bid Procedures constitute the best mechanism by which to increase interest in the sale of the Assets among potential purchasers and to stimulate competitive bidding at the Auction.

37.     The Debtor believes that the sale of the Assets, pursuant to the Bid Procedures, in any combination that results in the highest and best purchase price will maximize the value of the Assets for the benefit of creditors.  Additionally, the Debtor notes that it will reduce its administrative costs by the sale of the Assets. For these reasons, the Debtor has determined, in the exercise of its business judgment, to proceed with the sale pursuant to the Bid Procedures.

38.     In light of the facts and circumstances of these cases, the Debtor submits that it has articulated sound business reasons for a sale of the Assets pursuant to the Bid Procedures. *See, e.g., Inc. v. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 3.61, 366-69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to Section 363(b) just five weeks after the petition date where the debtor was suffering operating losses); *see also In re Tempo Technology*, 202 B.R. 363, 369-70 (D. Del. 1996) (approving a sale of all of the debtor's assets, within a month after the petition date, where the debtor faced a cash shortfall, operated in an industry where there were few potential buyers, and anticipated continuing losses and a decline in value of the bankruptcy estates).

39.     Accordingly, the Debtor submits that the sale of the Assets is supported by sound business reasons and is in the best interests of its estates and creditors. Therefore, the Debtor

- 22 -

requests approval of the sale under section 363(b) of the Bankruptcy Code to the Prevailing

Bidders at the Auction.

    ii.    **The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests**

40.    Section 363(f) of the Bankruptcy Code states that:

> The trustee may sell Property under subsection (b) or (c) of this section free and clear of any interest in such Property of an entity other than the estate, only if –

>     (1)    applicable non-bankruptcy law permits sale of such Property free and clear of such interest;

>     (2)    such entity consents;

>     (3)    such interest is a lien and the price at which such Property is to be sold is greater than the aggregate value of all liens on such Property;

>     (4)    such interest is in a bona fide dispute; or

>     (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

41.    The Debtor is informed and believes that the Lenders have consented or will

consent to the sale of the Assets as set forth herein. Moreover, the Debtor has conducted a UCC

search of purported lienholders of its Assets in conjunction with the proposed sale. The Debtor

will serve such purported lienholders with the Motion, the Sale Notice and any Sale Order

approving the relief requested by this Motion.  Further, the Debtor will serve all known creditors

with this Motion, the Sale Notice and any Sale Order approving the relief requested in this

Motion.

42.    Accordingly, the Debtor submits that the Court should approve the sale of the

Assets, pursuant to the terms of the Bid Procedures and under Section 363(F) of the Bankruptcy

Code, free and clear of all liens, claims and interests, including, but not limited to, any successor

- 23 -

liability claims under any state or federal laws, and any potential claimants should be compelled

to look exclusively to the proceeds of the sale for satisfaction of its claims.

### iii. Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not in Violation of Section 363(n) of the Bankruptcy Code

43.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such Property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(n) of the Bankruptcy Code among other things provides that a

trustee may avoid a sale under such section if the sale price was controlled by an agreement

among potential bidders at the sale. While the Bankruptcy Code does not define "good faith," the

Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) has held

that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); *see also In re Coastal Industries, Inc.*, 63 B.R. 361, 369

(Bankr. N.D. Ohio 1986).

44.     The Debtor intends to make an appropriate showing at the Sale Hearing that the

APA of any Prevailing Bidder was negotiated in an arm's-length transaction in which the

Prevailing Bidder at all times acted in good faith under and otherwise in accordance with the

*Abbotts Dairies'* standards. Moreover, if any Prevailing Bidder is an "insider" or "affiliate" of

the Debtor, as those terms are defined in the Bankruptcy Code, the Debtor shall disclose the

identity of such party to the Court at the Auction and Sale Hearing, along with the facts and

- 24 -

circumstances surrounding the party's bids. The Debtor will submit evidence that neither it, nor any Prevailing Bidder, engaged in any conduct that would prevent the application of Section 363(m) of the Bankruptcy Code or cause the application of, or implicate Section 363(n) of the Bankruptcy Code, with respect to the consummation of the sale contemplated herein.

45.     The Debtor thus requests that the Court find that each Prevailing Bidder has purchased the Assets for which they were a Prevailing Bidder in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and are entitled to the protections of Sections 363(m) and (n) of the Bankruptcy Code.

C.     **Approval of the Notice of Assumption and Assignment of Contracts**

46.     The standard for a debtor to assume and assign or reject an executory contract or unexpired lease pursuant to Section 365 of the Bankruptcy Code is whether the debtor's decision is made with its sound business judgment. *See, e.g.*, *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F. 3d 1095, 1099 (2d Cir. 1993) (noting that Section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.").

47.     The Debtor believes that it has exercised sound business judgment in determining which leases and contracts should be assumed and in calculating the Cure Amount due for such agreements. As soon as reasonably possible after finalizing the Stalking Horse APA, the Debtor shall prepare and file a schedule of the Assigned Leases and Contracts, including the Cure Amounts for each agreement. Any non-debtor party to an Assigned Lease or Contract who disputes the calculation of its Cure Amount must file an objection with the Bankruptcy Court and serve Debtor's counsel that either (i) objects to the Cure Amount and provides a cure claim that

is different from the respective Cure Amount; or (ii) objects to the assumption and assignment of their contract. If an objection to a scheduled Cure Amount or the assumption and assignment of the contract is filed in accordance with this paragraph, the Bankruptcy Court will hear that objection at the Sale Hearing.

48.     The Debtor asserts that, upon compliance with the procedures outlined above, it will have met all requirements of Sections 365(b) and (f) of the Bankruptcy Code and should be permitted to assume and assign the Contracts to the Prevailing Bidder.

49.     The assumption of the Contracts is an integral part of the sale of the Assets. It is thus an appropriate exercise of business judgment for the Debtor to agree to assume the Contracts.

## Notice

50.     Notice of this Motion has been provided to the following parties, or their counsel of record: (a) the Office of the United States Trustee; (b) the Lenders; (c) all known creditors; (d) all parties that have requested special notice; (e) any party that has previously provided a written expression of interest or a letter of intent to either the Debtor of Amherst to acquire any of the Acquired Assets; and (f) all parties that have appeared in this case and will automatically receive notice via the Court's ECF system.

51.     The Debtor will serve the Sale Notice as directed by the Court.

52.     The Debtor further seeks a waiver of any stay of effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "[a] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, upon the entry of the Sale Order, the immediate sale of

the Assets is essential to its success. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies. Therefore, the Debtor requests, pursuant to Bankruptcy Rules 6004(h), that the Sale Orders become effective immediately upon entry.

53.     No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (a) enter the Bid Procedures Order; and (b) grant such other and further relief as the Court may deem proper.

DATED:  October 21, 2013

Respectfully submitted,

*/s/*  Marc B. Merklin
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Brouse McDowell LPA
338 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com

*Proposed Counsel for the Debtor and*
*Debtor in Possession*

869009

- 27 -